UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERNEST RUMPH, | ) | CASE NO.: 1:10CV429 |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Ernest Rumph's Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI.) The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his June 25, 2008 decision in finding that Plaintiff was not disabled because he could perform a significant number of jobs given his limitations and vocational factors (Tr.22-23). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I.  PROCEDURAL HISTORY

Plaintiff, Ernest Rumph, filed his application for DIB and SSI on September 29, 2005, alleging he became disabled on September 20, 2005 (Tr. 195, 199). Plaintiff's application was denied initially and on reconsideration (Tr. 155-168). Plaintiff requested a hearing before an ALJ, and on April 28, 2008, a hearing was held where Plaintiff appeared with counsel and testified before an ALJ as did vocational expert, Kathleen Reis (Tr. 129-130).

On June 25, 2008, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 12-24). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-5). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 1383(c).

**II**.    **STATEMENTS OF FACTS**

Plaintiff was born on April 9, 1956, which made him 52 years old at the time of the hearing before the ALJ (Tr. 195). He completed the 11th grade. Plaintiff worked as a steelworker for Apex Steel Processing Corporation from 1994 to 2005 (Tr. 207-208, 262-265, 279).

**III**.    **SUMMARY OF MEDICAL EVIDENCE**

According to Plaintiff, Plaintiff sustained a work-related back injury in March 1994 (Tr. 363). He returned to work six months after his injury, but because of continuing pain, he had surgery in 2003 to remove disks in his lower back (Tr. 363). Subsequent medical records through September 2005 document complaints unrelated to Plaintiff's back injury, other than a secondary diagnosis of back pain, status-post lumbar surgery, in March 2004 (Tr. 307,309, 326-27).

In October, November, and December 2005, Plaintiff visited various doctors at Westshore Family Practice one or more times a week for various passive modality therapies (Tr. 284-92, 297, 299, 302-03, 333-38). At these visits, Plaintiff complained of chronic lower back pain, leg pain, muscle spasms, and difficulty sleeping due to his pain, and his doctor observed some decreased range of motion (Tr. 284-92, 297, 299, 302-03, 333-38). However, a nerve conduction study conducted in October 2005 was normal, showing no evidence of radiculopathy affecting the legs or polyneuropathy (Tr. 296). An MRI of the lumbar spine taken in October 2005 and an x-ray taken in December 2005 showed surgical changes at L5 and S1 without complication and no significant canal or foraminal stenosis in the lumbar spine (Tr. 117, 347).

In December 2005, Joy Marshall, M.D., of Westshore Family Practice noted that Plaintiff also had received four trigger point injections over the past six months, which had decreased his pain, increased his range of motion, and helped him function in daily activities (Tr. 361). Dr. Marshall indicated that Plaintiff participated in physical therapy one to two times a week and home exercises daily (Tr. 361).

Wilfredo Paras, M.D., performed a consultative examination in December 2005, at which Plaintiff reported his surgical history and current symptoms (Tr. 363). Plaintiff reported that he could drive as needed for short distances (Tr. 363). Plaintiff reported that he was capable of self-

care and performing light chores, such as light cleaning and cooking (Tr. 364). He reported that he read, watched TV, and rested most of the day (Tr. 364). He indicated that after sitting for one to one-and-a-half hours or standing for 45 minute, he experienced low back pain radiating to his leg (Tr. 364). He stated that he avoided bending and walked to a store half a block away about once a week (Tr. 364). He indicated that he could only handle objects weighing five to ten pounds (Tr. 364). He used the following medications: Celebrex, Flexeril, Tramadol, Lidoderm patches, and Capsicium cream (Tr. 364).

During physical examination, Dr. Paras observed severe loss of the normal lumbar lordosis; no motor or sensory deficit; good muscle strength; no muscle atrophy; no muscle spasm; painful range of motion; bilaterally reduced deep tendon reflexes; and moderate tenderness in the right low back (Tr. 364-66, 368). Plaintiff walked slowly without an assistive device (Tr. 364). Dr. Paras concluded that Plaintiff's abilities were limited by his constant low back pain, right lumbar radiculopathy, and frequent muscle spasms in the right lower extremity, although he did not opine as to any specific limitations (Tr. 364).

In late December 2005, the managed care provider of Plaintiff's employer denied coverage for injections, electric stimulation, massage, traction, diathermia, ultrasound, and hydrotherapy for the period between December 2005 and February 2006 (Tr. 407-408). The managed care provider explained that the requested variety of passive physical modalities was "excessive" and that the requested treatment was inappropriate (Tr. 407-08).

At Plaintiff's January 2006 appointment, Plaintiff received hydro and diathermia therapies (Tr. 332). He exhibited pain to palpation of his lumbar spine and decreased range of motion of his right leg (Tr. 332).

State agency physician Jerry McCloud, M.D., reviewed Plaintiff's medical records in January 2006 and opined that Plaintiff could lift and/or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; and push and/or pull without limitation (Tr. 370). Dr. McCloud noted Plaintiff's history of back pain with radiculopathy and some decreased range of motion, reduced deep tendon reflexes, and moderated right low back tenderness without muscle guarding (Tr. 370). However, he also considered evidence that Plaintiff's cranial nerves were grossly intact and that

Plaintiff exhibited no motor or sensory deficit, muscle atrophy, joint heat, or swelling (Tr. 370). Dr. McCloud opined that Plaintiff could occasionally stoop, crouch, and climb ladders, ropes, and scaffolds and had no manipulative, visual, communicative, or environmental limitations (Tr. 371-373). Dr. McCloud assessed Plaintiff as partially credible, but felt that a person of Plaintiff's stature (5'10") should be able to lift more than ten pounds, even given his chronic back pain history (Tr. 374).

On January 13, 2006, Dr. Marshall estimated on a Bureau of Workers' Compensation form that Plaintiff could return to work on February 20, 2006 (Tr. 349). She indicated that his condition had not yet reached a treatment plateau (Tr. 349).

In February 2006, Dr. Marshall completed a Physician's Report of Work Ability for the Bureau of Workers' Compensation (Tr. 360). Dr. Marshall opined that Plaintiff's restrictions were permanent and did not specify a return to work date (tr. 360). She opined that Plaintiff was unable to lift/carry weights under 10 pounds and could never bend, twist/turn, reach below the knee, push/pull, or squat/kneel (tr. 360). She opined that Plaintiff could frequently stand/walk and sit, where "frequent" was defined as 34 to 66 percent of an eight-hour work day (Tr. 360). She did not indicated any limitations on use of his hands, driving, or total number of hours of work per day (Tr. 360) Dr. Marshall's explanation of these limitations were Plaintiff's history of lower spine fusion, large bilateral disk herniation, muscle spasms, and EMG results that were significant for radiculopathy (Tr. 360).

In March 2006, Plaintiff visited Dr. Marshall, who observed a pronounced gait disturbance and pain with bending and change in position (Tr. 330).

In April 2006, the managed care provider of Plaintiff's employer denied his appeal for passive modality therapies, noting that the MRI and EMG from October 2005 were normal other than indicating the 2003 spinal fusion; that traction, ultrasound, and diathermy were not recommended or effective treatments for Plaintiff's condition; and that passive modalities could cause dependency (Tr. 402).

In May 2006, Plaintiff visited Westshore Family Practice twice, where he received treatment from Dr. Marshall and another physician (Tr. 328-29). The notes indicate that Plaintiff's muscle

spasms were diagnosed as restless leg syndrome, he continued to complain of back pain, and he exhibited some decreased range of motion (Tr. 328-29).

Plaintiff reported in his disability paperwork dated July 2006 that he had difficulties dressing and bathing, did not do chores because of difficulties standing and bending, went outside often during the day, and watched TV and sat on the porch every day for six to eight hours (Tr. 245-48). He reported that his wife prepared meals and that he did not drive because of his spasms (Tr. 246-47).

Later that month, Jon Starr, M.D., reviewed the updated record and affirmed Dr. McCloud's January 2006 opinion (Tr. 382).

Plaintiff sought treatment from Dr. Marshall and her colleagues in August, September, and October 2006, complaining of muscle spasms and back and right leg pain (Tr. 383, 449-51). During the physical examinations, Plaintiff exhibited decreased and/or painful range of motion (Tr. 383, 449-51). In August, plaintiff reported that Lidocaine patches controlled pain, but that after the patches were removed, the pain returned immediately (tr. 383). During his September 28, 2006 visit, Plaintiff reported that his muscle spasms had decreased Tr. 451). That same day, Dr. Marshall estimated on a form for the Bureau of Workers' Compensation that Plaintiff could return to work on December 1, 2006 (Tr. 396). She indicated that his condition had not yet reached a treatment plateau (Tr. 396).

Plaintiff complained of muscle spasms and back pain at his November 29, 2006 follow-up appointment for medication management (Tr. 448). That day, Dr. Marshall completed a Medical Source Statement: Patient's Physical Capacity for the disability purposed (Tr. 477-79). Dr. Marshall opined that Plaintiff could not lift/carry more than 10 pounds "for any period of time w[ith]o[ut] being incapacitated," citing his spinal surgical history and constant dull, aching pain (Tr. 478). Dr. Marshall opined that Plaintiff's ability to stand/walk was limited and that he could not walk for more than 20 minutes (tr. 478). She further opined that Plaintiff's sitting was affected, and he needed to change position every 30 minutes (Tr. 478). Dr. Marshall marked a box to indicate that Plaintiff needed to rest during the day at approximately two hour intervals, was uncomfortable lying down for a long time, and could not sleep due to pain (Tr. 479).

Dr. Marshall opined that Plaintiff could rarely climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, and push/pull; and frequently see, hear, speak, and engage in fine and gross manipulation (Tr. 479). She opined that Plaintiff was restricted with respect to heights, moving machinery, and temperature extremes (Tr. 479). As support for these limitations, she cited Plaintiff's residual pain from his spinal surgery (Tr. 479). She indicated that a brace but no cane, walker, or TENS unit had been prescribed (Tr. 479).

In a Background Questionnaire that Plaintiff completed the next month, he indicated that he could only lift five pounds and that he left his previous job in March 2005 because he was "asked to quit" (Tr. 263).

On June 4, 2007, Dr. Marshall completed another Medical Source Statement: Patient's Physical Capacity (Tr. 482-83). Dr. Marshall again opined that Plaintiff could not lift or carry more than 10 pounds (Tr. 482). She indicated that his standing/walking and sitting for "[a]ny long period of time" was painful due to residual pain from his spinal fusion and that he needed to change his position constantly (Tr. 482). As in the previous assessment, Dr. Marshall indicated that Plaintiff could rarely climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel and push/pull; and frequently engage in fine and gross manipulation (tr. 483). In support, she cited Plaitniff's chronic lower back pain from his spinal surgery, decreased range of motion, and numbness (Tr. 483). Dr. Marshall opined that Plaintiff was restricted with respect to heights, moving machinery, temperature extremes, chemicals, dust, and fumes (Tr. 483). She checked a box indicating that his pain level was severe (Tr. 483).

The same day, Dr. Marshall completed a Medical Source Statement: Patient's Mental Capacity (Tr. 480-81). Dr. Marshall assessed Plaintiff's ability to follow work rules, maintain attention and concentration for two hour segments, respond appropriately to changes in the routine setting, maintain regular attendance and be punctual, and deal with work stresses was "Poor or None," noting that his pain interfered with these abilities (Tr. 480-81). She assessed his ability as "Good" with respect to using judgment and "Unlimited/Very Good" in dealing with the public, relating to co-workers, interacting with supervisor(s), functioning independently without special supervision, and working in coordination with or proximity to others  without being unduly

distracted or distracting, noting this was true only if he were not in pain (Tr. 480). She opined that his abilities were "Unlimited/Very Good" in all areas of intellectual functioning and making personal and social adjustment (Tr. 481). Dr. Marshall commented that Plaintiff's psychological symptoms were "very difficult to separate" from his physiological symptoms, and that with his "fear of pain exacerbation[,] he is not a good candidate for regular work d[ue] to anxiety + fear [of increas]ing pain" (Tr. 481).

Plaintiff submitted evidence to the Appeals Council pertaining to his post hearing medical treatment (Tr. 489-539) and discusses this evidence in his brief. (Pl.'s Br. at 6-7.)  In its January 2010 Notice of Appeals Council Action, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, finding that the additional evidence did not provide a basis for changing the ALJ's decision and that the new medical evidence pertained to the period after the ALJ's decision (Tr. 2).

The additional evidence that Plaintiff submitted indicates that he primarily sought treatment during the latter half of 2008 for neck pain, which he sustained after "lifting and carrying heavy objects over his R[ight] shoulder" (Tr. 515, 528). Such records contradict Plaintiff's self-reports that he could not lift more than five pounds (Tr. 263). The notes of Shu Huang, M.D., also document normal gait, normal clinical findings, and a lack of complaints with respect to the back and extremities, which suggest that Plaintiff no longer had back pain (Tr. 516, 528). This additional evidence would not have changed the ALJ's decision.

### IV.     SUMMARY OF TESTIMONY

First, Plaintiff testified that he could not work because he experienced stiffness, pain, and muscle spasms in his leg at night, which were relieved by taking a pill and walking out the spasm (Tr. 121-22). Plaintiff estimated that the frequency of his muscle spasms ranged from a couple times a week to once every week or two weeks (Tr. 125). Because this interrupted his sleep and because he sometimes had pain in the morning related to the weather, he was late to work (Tr. 121-22).

Plaintiff testified that back injections "work[ed] all month long" and that he wore a brace in

and off every day (Tr. 124). He testified that therapy had helped, but that workman's compensation no longer covered it (Tr. 125). He testified that he could stand for about 30 to 40 minutes; walk for about 15 to 20 minutes on a flat surface without a break; and sit for about 20 to 30 minutes before needing to shake his legs (Tr. 126-27).

Thereafter, the ALJ asked vocational expert Kathleen Reis to consider a hypothetical person of Plaintiff's age, education, and work experience who had the residual functional capacity to perform the full range of light work, except that he could stand or walk for a total of four hours in an eight-hour workday, required a sit/stand option, could sit for a total of four hours in an eight-hour workday, was precluded from frequent bending, could only occasionally stoop or crouch, could not climb ladders or scaffolds, and could not work pedals with his feet (Tr. 129). Ms. Reis opined that this person could perform numerous jobs, identifying the following representative jobs: mailroom clerk (170,000 jobs nationally), cashier with a sit/stand option (450,000 jobs nationally), and office helper (160,000 jobs nationally) (Tr. 129-30).

Plaintiff's attorney then asked Ms. Reis to consider a second hypothetical person who had the same limitations as the first hypothetical person, except that his standing and walking was limited to a total of two hours in an eight-hour day, with the sitting capacity increased to six hours in an eight-hour day (Tr. 130). Ms. Reis testified that this person would not be able to perform any light jobs (Tr. 130).

### V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made

        without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, Id.*; *Walters*, 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VII. SUMMARY OF TESTIMONY

Plaintiff asserts one assignment of error:

<u>Whether the ALJ properly evaluated Plaintiff's Residual Functional Capacity in determining he could perform light work of a mailroom clerk, cashier, or office helper</u> (Pl. Brief page 1).

The ALJ correctly concluded that, despite Plaintiff's impairments, Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of light work (Tr. 19). Substantial evidence supports the ALJ's conclusion; including the opinion of Dr. McCloud, which was affirmed by Dr. Starr; inconsistencies among Plaintiff's self-reports; the absence of diagnostic test results supporting Plaintiff's complaints of disabling back pain; Plaintiff's treatment regimen; and Plaintiff's daily activities.

The ALJ relied upon the opinion of Dr. McCloud, which Dr. Starr affirmed after reviewing the updated record, that Plaintiff could stand and/or walk for six hours in an eight-hour day; perform light exertional work; and occasionally stoop, crouch, and climb ladders, ropes, and scaffolds (Tr. 22, 370, 382). These less restrictive opinions provided support for the ALJ's RFC finding. The ALJ, after considering the entire record, found Plaintiff to be slightly more limited. The ALJ found that Plaintiff was only able to stand or walk for a total of four hours and sit for a total of four hours in an eight-hour workday and could not climb ladders or scaffolds at all, and incorporating additional limitations to accommodate Plaintiff's subjective complaints of back and leg pain: a sit/stand option, no frequent bending, and no use of foot pedals (Tr. 19). Thus, the limitations in the ALJ's RFC finding were supported by the opinion of Dr. McCLoud and Dr. Starr.

Plaintiff made inconsistent statements that created issues on his credibility on his other allegations (Tr. 21). The ALJ indicated that Plaintiff reported during his initial disability interview that he quit because his "[c]ompany closed," but that Plaintiff later reported that he was "asked to quit" (Tr. 21, 229, 263). The ALJ also noted a discrepancy in the level of activity Plaintiff claimed (Tr. 21). Plaintiff told Dr. Paras that he performed light chores such as light cleaning and cooking, yet indicated on his disability paperwork that he could no do chores because of difficulties standing

-10-

and bending and that he did not cook (Tr. 21, 246-7, 364). The ALJ correctly relied upon contradictions in Plaintiff's statements when assessing Plaintiff's credibility (Tr. 21.)

The ALJ also considered normal objective findings, citing Plaintiff's October 2005 lumbar spine MRI, which showed no complications related to his spinal fusion and no significant stenosis, and a normal nerve conduction study of the lower extremities, which showed no radiculopathy or polyneuropathy (Tr. 17-18, 296, 347). The ALJ also noted that, during clinical examination, Plaintiff exhibited no neurological deficits or muscle atrophy, a conclusion that is consistent with Dr. Paras' findings and Dr. McCloud's characterization of the evidence (Tr. 19), 364-66, 368, 370).

In addition, the ALJ considered Plaintiff's treatment regimen, noting that, although Plaintiff used a back brace, he did not require an assistive device for ambulation or use a TENS (Transcutaneous Electrical Nerve Stimulation) unit (Tr. 20-21, 124). Plaintiff also testified that injections "work[ed] all month long" in relieving his back pain, and Dr. Marshall's treatment notes elaborate that Plaintiff enjoyed increased range of motion, pain relief, and functionality in daily activities after receiving injections (Tr. 361). The record also reflects that Lidocaine patches controlled pain (Tr. 383.)

The ALJ also considered Plaintiff's activities when he assessed his subjective complaints, noting that Plaintiff drove, performed light chores, watched TV and sat on the porch every day for six to eight hours, went outside often during the day, climbed stairs, could walk half a block, shopped, and engaged in self-care (Tr. 20-21, 247-48, 363-64). Thus, the ALJ's RFC finding was supported by substantial evidence.

Plaintiff attacks the ALJ's RFC finding on several grounds. First, he contends that the RFC finding did not incorporate the extensive physical limitations that Dr. Marshall set forth in her opinions from November 2006 and June 2007. (Pl.'s Br. at 13.) However, in reaching his RFC finding, the ALJ explained that he considered, but gave less weight to, the opinions of Dr. Marshall because her opinions were neither well-supported nor consistent with "the totality of the evidence" (Tr. 21). The regulations provide that if "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the

-11-

claimant's] case record, we will give it controlling weight." 20 C.F.R. Section 404.1527(d)(2).

The ALJ explained that Dr. Marshall's opinions were "conclusory" and not well-supported by objective evidence (Tr. 21), noting normal MRI and nerve conduction test results (Tr. 21, 296, 347). The ALJ also considered that Plaintiff exhibited no neurological deficits or muscle atrophy (Tr. 19, 370). Dr. Paras observed no motor or sensory deficit, no muscle atrophy, no muscle spasm, and good muscle strength (Tr. 364-66, 368). The record further reflects that Plaintiff's muscle spasms were caused by restless leg syndrome (nocturnal myoclonus), which is not a sign of a serious disorder, and that his nightly leg spasms were intermittent and reduced with medication (Tr. 121, 125, 451).

It appears that the limited lifting, sitting, and standing restrictions in Dr. Marshall's opinion were based mostly on Plaintiff's statements. Plaintiff reported not being able to lift more than five pounds (Tr. 263) or five to ten pounds at most (tr. 364); only being able to walk for about 15 to 20 minutes (Tr. 127); and only being able to sit for about 20 to 30 minutes before needing to shake his legs (Tr. 127); Furthermore, Dr. Marshall opined that Plaintiff could not lift/carry more than 10 pounds, could not walk for more than 20 minutes, and needed to change position every 30 minutes (Tr. 478). A physician's opinion that is based almost entirely on a claimant's subjective assessment of his own capabilities is not entitled to deference. *See, e.g., Warner v. Comm'r of Soc. Sec.*, 375 F. 3d 387, 391 (6th Cir. 2004). The ALJ therefore correctly concluded that Dr. Marshall's opinions were 'conclusory' and not supported by substantial evidence (Tr. 21).

The ALJ further explained that Dr. Marshall's opinions were not consistent with the other evidence (Tr. 21). The ALJ felt that the extreme lifting limitations that Dr. Marshall included in her opinion were inconsistent with Plaintiff's treatment regimen and activities (Tr. 19, 21). In addition, the ALJ gave significant weight to the opinion of Dr. McCloud (Tr. 22), who found Plaintiff's reported limitations on lifting less than fully credible because he felt that a person of Plaintiff's stature (5'10") should be able to lift more than ten pounds, even given his chronic back pain history (Tr. 374).

The ALJ also noted that Dr. Marshall's opinion that Plaintiff could not stand, sit, or lay down for "[a]ny long period of time" was inconsistent with Plaintiff's testimony that he watched TV

-12-

and sat on the porch every day for six to eight hours (Tr. 18, 21, 248, 482). In addition, the record reflects that these limitations on standing, walking, and sitting were inconsistent with Dr. Marshall's February 2006 assessment, in which she opined that Plaintiff could stand/walk and sit frequently; i.e., for 34 to 66 percent of an eight-hour day (Tr. 248, 360, 482).

Furthermore, Dr. Marshall's November 2006 and June 2007 opinions submitted for disability purposes were inconsistent with her previous opinions for worker's compensation purposes. As the ALJ noted, Dr. Marshall previously issued opinions for worker's compensation purposes in January 2006 and September 2006, in which she estimated that Plaintiff could return to work in February 2006 and December 2006, respectively (Tr. 18, 349, 396). The record reflects that, in both of these assessments, Dr. Marshall indicated that Plaintiff's condition still had the potential to improve (Tr. 349, 396). These opinions that Plaintiff could return to work in the near future were inconsistent with Dr. Marshall's opinions submitted for disability purposes. In her February 2006 opinion, Dr. Marshall cited large bilateral disk herniation and EMG results significant for radiculopathy as support for her opinion that Plaintiff could not engage in lifting and postural activities (Tr. 360). However, she appears to have cited pre-surgical objective findings, as objective test results from 2005 showed no significant herniation and no radiculopathy (Tr. 117, 296, 347, 402). Thus, substantial evidence supports the ALJ's decision not to accord Dr. Marshall's opinions controlling weight. By explaining why Dr. Marshall's opinion was not supported by objective findings and inconsistent with medical and non-medical evidence of record, the ALJ satisfied the requirement for not giving greater deference to Dr. Marshall's opinion under the treating physician rule. See 20 C.F.R. Section 404.1527(d)(2);(d)(3). Accordingly, the presumption has been rebutted and the ALJ need not afford controlling weight to the opinion of the treating physician.

Plaintiff also argues that the ALJ's hypothetical was inaccurate because the limitations were insufficient to address Plaintiff's reported difficulties with lifting; stiffness; back, shoulder, and leg pain; muscle spasms; difficulty sleeping; and decreased leg strength. (Pl.'s Br. At 11, 13.) However, the ALJ found Plaintiffs statements concerning the "intensity, persistence and limiting effects" of his symptoms "not entirely credible" (Tr. 20). The ALJ was only required to include those limitations in his hypothetical question that he found credible. Here the ALJ based his

-13-

decision on a review of the evidence, and incorporated numerous exertional and postural limitations into his residual functional capacity finding in response to Plaintiff's allegations of pain to the extent they were credible (Tr. 19). Thus, Plaintiff's argument attacking the accurateness of the ALJ's hypothetical is not supported by substantial evidence.

Plaintiff next argues that his exertional capacity more closely resembled the definition of sedentary work, and that the Medical-Vocational rules applying to sedentary work would have directed a finding of disabled. (Pl.'s Br. At 13-14.) However, because Plaintiff's exertional capacity fell in between light and sedentary work, and the light and sedentary rules would direct opposite conclusions, the ALJ correctly relied on a vocational expert to confirm that Plaintiff was capable of performing a significant number of light jobs (Tr. 129-30). The ALJ reasonably found that Plaintiff could stand for four hours and lift 20 pounds clearly exceeded the exertional requirements of sedentary work. Thus, the ALJ correctly relied on vocational expert testimony in concluding that Plaintiff could perform a significant number of light jobs (Tr. 22).

## VIII.  CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a significant number of jobs given his limitations and vocational factors.

DATE: June 29, 2011      */s/George J. Limbert*
    GEORGE J. LIMBERT
    UNITED STATES MAGISTRATE JUDGE